# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| CARMEN A. MOSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:08-CV-211 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Carmen A. Moss appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Moss applied for DIB on December 27, 2004, alleging that she became disabled on March 19, 2004. (Tr. 81-83.) The Commissioner denied her application initially and upon reconsideration, and Moss requested an administrative hearing. (Tr. 64-66, 68-72.) On January 24, 2007, Administrative Law Judge (ALJ) Terry Miller conducted a hearing at which Moss (who was represented by counsel), her husband, and a vocational expert ("VE") testified. (Tr. 579.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

On October 4, 2007, the ALJ rendered a partially favorable decision to Moss, concluding that she was disabled commencing February 10, 2006, but not prior to that date. (Tr. 26-42.) After a timely request for review, the Appeals Council denied review, which made the decision of the ALJ the final decision of the Commissioner. (Tr. 5-7.)

Moss filed a complaint with this Court on September 16, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.) She argues that the ALJ failed to give reasons why he had discredited her symptom testimony with respect to the period prior to February 10, 2006, and that he improperly evaluated the opinions of her treating psychiatrist, Syed Mumtaz, M.D., and her mental health therapist, Linda Hartley. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 17, 22.)

## II. FACTUAL BACKGROUND[2]

### *A. General Background*

Moss was fifty-four years old at the time of her alleged onset date. (Tr. 81.) She had a General Equivalency Degree and worked for the United States Postal Service as a letter carrier from 1987 until her alleged onset date of March 19, 2004, when the Postal Service found her medically disabled. (Tr. 90-91, 103.)

Moss's initial application alleged numerous impairments including severe depression, irritable bowel disease, high blood pressure, cirrhosis, hallucinations, suicidal thoughts, and episodic transient ischemic attacks. (Tr. 89-90.) Moss alleges in her Opening Brief that in 2006, she also developed cervical and thoracic radiculopathy. (Opening Br. 2.)

---

[2] In the interest of brevity, this opinion recounts only the portions of the 619 page record that are necessary to the decision. For example, much of the evidence of Moss's alleged physical impairments has been omitted for this reason.

2

*B. Hearing Testimony*

Moss testified at her hearing that she stopped working because she had two strokes in March 2004. (Tr. 587.) She stated that she then went to live with her daughter in Pennsylvania and had a nervous breakdown while there. (Tr. 603.) Moss said she spent two weeks in the hospital and completed follow-up treatment by going to classes three times a week for about four to six weeks. (Tr. 604.) She explained that she began treatment with Ms. Hartley and Dr. Mumtaz immediately upon her return to Indiana. (Tr. 607.) Moss claimed that, for about eighteen months after her stroke, she was only able to walk to and from her mailbox, yet she was so anxious that she spent her days pacing. (Tr. 607-08.) She said she could not concentrate or comprehend during that time, and could not be around people. (Tr. 609.)

Moss testified that she attends church and does not have problems associating with people she is "real familiar with." (Tr. 598-99.) She said she had depression, was often exhausted, and took three-hour naps daily. (Tr. 588-89, 600.) Her activities consisted of going to church (when she felt well) and quilting, but her activities were limited because she did not feel comfortable driving outside a one-mile radius of her home for fear of getting lost. (Tr. 585, 599-600.) She claimed that she had difficulty comprehending and concentrating and trouble remembering what she read in the newspaper. (Tr. 588, 596.)

Moss further testified that although she cooked for her and her husband, she needed to set a timer to remind her that she had put something on the stove or in the oven. (Tr. 597.) She said she was able to grocery shop, clean one or two rooms per day, do laundry, feed her cat and dog and take the dog for a daily morning walk, and walk to the doughnut shop and read the newspaper, but her husband usually took her to the grocery store and put away the clean laundry.

3

(Tr. 597-99.) Moss testified that the medications prescribed by her treating psychiatrist helped her condition, but they made her tired and weak. (Tr. 595.)

*C. Moss's Relevant Treatment History*

From 1980 and 1997, Moss sought treatment for depression. (Tr. 94-96.) In March 2002, Moss was diagnosed with major depression, which was moderate to severe, and was assigned a Global Assessment of Functioning (GAF) score[3] of 56. (Tr. 222.) During that time, Moss experienced symptoms including crying spells, low interest, no energy, sleep difficulty, and forgetfulness. (Tr. 218.) Moss continued with her treatment for depression from March 2002 to September 2003. (Tr. 199, 210-24.)

Moss was hospitalized once in March 2003 for chest pain and twice in March 2004 for passing out due to abdominal pain and temporarily becoming paralyzed. (Tr. 199, 225, 243.) Moss was also on medication for depression. (Tr. 245.)

On April 1, 2004, Moss presented to G.L. Arnold, M.D., in Pittsburgh, Pennsylvania, for her abdominal problems. (Tr. 287.) Dr. Arnold noted that Moss had severe depression, and recommended that she go to a new psychiatrist and therapist when she returned to Indiana. (Tr. 288.) He treated Moss again later that month, still reporting significant depression as well as

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21 to 30 indicates that behavior is considerably influenced by delusion or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. *Id.* at 34. A GAF score of 31 to 40 reflects some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.* And, a GAF score of 71 to 80 reflects that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors" and indicates "no more than slight impairment in social, occupation, or school functioning." *Id.*

4

abnormal findings that Moss wished that she was not alive and that she hated being around lots of people. (Tr. 272.) Dr. Arnold's assessment was major depression, severe, and he discussed with family members her admission to a psychiatric unit. (Tr. 272.)

On April 28, 2004, Moss was admitted to the University of Pittsburgh Medical Center (UPMC) Emergency Department with gastrointestinal problems and depression with vague suicidal ideation. (Tr. 475.) On April 29, 2004, Ms. Moss was admitted for psychiatric treatment at UPMC South Side. (Tr. 485.) A consultation report dated April 29, 2004, from Patrick S. Hong, M.D., included diagnoses of inflammatory bowel disease and major depression. (Tr. 504.) A Social Work Psychosocial Assessment/Admit Note dated April 30, 2004, indicated that Moss had major depression, recurrent, with a GAF of 25. (Tr. 517.) Moss remained hospitalized and received treatment until her discharge on May 6, 2004. (Tr. 468.) Upon discharge, Jeffrey C. Wilson, M.D., diagnosed her with major depressive affective disorder, recurrent episodes, severe with psychotic behavior; essential hypertension; hypopotassemia; and irritable bowel syndrome. (Tr. 468.) Intensive outpatient treatment was arranged through the Western Psychiatric Institute and Clinic (WPIC) and Moss's family was alerted to the possibility of suicidality. (Tr. 468.) Upon discharge, Moss no longer had a passive death wish but possessed high risk factors for suicidality. (Tr. 469.) Her insight and judgment seemed improved and her prognosis was fair. (Tr. 469.)

The June WPIC records indicate that on June 2, 2004, Moss had a medication management follow-up with Helenna Nakama, M.D., who planned to treat Moss aggressively. (Tr. 576-78.) Dr. Nakama noted that Moss was doing better and no longer having hallucinations. (Tr. 576.) Moss also had individual therapy sessions with Susan Carpenter, PHD, that month,

5

who reported that Moss's mood was depressed with restricted affect. (Tr. 574-75.) Moss was discharged to return to Fort Wayne, Indiana, and was informed of the need to find a local treatment team, including a therapist and a psychiatrist. (Tr. 574.)

Upon Moss's return to Indiana in June 2004, she began attending therapy sessions with Linda Hartley, L.C.S.W., for her depression. (Tr. 386-423.) These sessions usually occurred one to two times per month and continued through May 2007. (Tr. 386-423.) Moss's symptoms fluctuated in severity; although Ms. Hartley reported improvement at some sessions, other times she related that Moss had increased depression and anxiety and a host of other problems, such as anger issues, mouth ticks, and trouble sleeping. (Tr. 386-423.)

Along with her sessions with Ms. Hartley, Moss received psychiatric treatment from Syed Mumtaz, M.D., a psychiatrist. In his initial evaluation in July 2004, Dr. Mumtaz diagnosed Plaintiff with major depression and assessed her GAF at 58, reflecting moderate difficulty in functioning. (Tr. 336.) In his August through December 2004 treatment sessions, Dr. Mumtaz noted Moss's reports of anxiety, pacing a lot, and lack of desire to leave her house, but he also noted that she was in a better mood; was sleeping well and felt less tired; and was not having psychotic episodes, hearing voices, or thoughts of self harm. (Tr. 331-33.) Dr. Mumtaz opined in a letter dated December 21, 2004, that Moss's depression affected her concentration, energy level, and functional capabilities. (Tr. 317.) He added that she was not able to perform her routine duties as expected because of her mental illness. (Tr. 317.)

In January 2005, Dr. Mumtaz completed a psychiatric exam of Moss for Social Security, indicating a diagnosis of major depression and a current GAF score of 55, reflecting moderate difficulty in functioning. (Tr. 323.) Dr. Mumtaz reported that she was able to clean one room

6

per day, do laundry, and cook daily meals, but that she had limiting symptoms such as poor concentration, a lack of confidence, tiredness, and anxiety. (Tr. 327.) He noted that she improved in her mood and ability to take care of herself independently. (Tr. 328.) His prognosis was that Moss was "better" but still unable to perform at her previous level of functioning. (Tr. 328).

On January 28, 2005, Social Security non-examining medical consultant, J. Pressner Ph.D./JAP, responded to a Psychiatric Review Technique form. (Tr. 352-65.) Dr. Pressner found that Moss had an affective disorder under Listing 12.04 that did not precisely satisfy the diagnostic criteria of the Listing; however, the handwriting naming the disorder is illegible. (Tr. 355.) On the Rating of Functional Limitations, the "B" Criteria, Dr. Pressner found that Moss had mild restrictions of activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (Tr. 362.) Dr. Pressner, however, did not answer Part III B of the form regarding the "C" Criteria of the Listings. (Tr. 363.)

Dr. Pressner also assessed Moss's mental residual functional capacity (RFC) and opined that she was able to understand, remember, and carry out simple instructions; to make simple work-related decisions; to remember locations and simple work-like procedures; and to anticipate usual hazards in the work place. (Tr. 370.) He further opined that Moss had normal mental pace and could attend to a task for up to two hours, but may have problems with prolonged or intensive concentration. (Tr. 370.) He also found that Moss was capable of maintaining a schedule and any problems with tardiness or absenteeism would be a matter of choice rather than an effect of her mental disorder. (Tr. 370.) Due to her social anxiety, Dr.

7

Pressner opined that Moss could not work with the general public or in jobs that required intensive, interpersonal contact with others, but she could relate adequately with co-workers and supervisors. (Tr. 370.) Dr. Pressner concluded that Moss had the ability to perform simple, repetitive tasks on a sustained basis without extraordinary accommodations. (Tr. 370.) These findings were later affirmed by another state agency physician. (Tr. 352.)

Moss continued to see Dr. Mumtaz (*see* Tr. 377-85), and in June 2006, he completed a mental assessment noting that Moss's symptoms of depression wax and wane but that she has shown improvement, and that her prognosis with medication and therapy was fair. (Tr. 372.) Dr. Mumtaz found that Moss experienced moderate restriction of activities of daily living; marked difficulties maintaining social functioning; marked deficiencies in concentration, persistence or pace; and one or two episodes of decompensation within past twelve months, each of at least two weeks duration. (Tr. 374.) Dr. Mumtaz also indicated that Moss would be absent from work more than four days per month as a result of her impairment, that the demands by others and fear of not meeting them timely is very crippling, and that she could not deal with conflict. (Tr. 371-75.) He assigned her current GAF of 45, indicating serious symptoms or any serious impairment in social, occupational, or school functioning, and a highest GAF over the past year of 50, which is at the very top end of functioning in the same decile. (Tr. 372.)

In a June 2007 letter, Ms. Hartley explained that Moss "has periods of time where she is able to use her thinking patterns to the positive and then she manages her feelings accordingly", but "there are times when the stressors of life supercede the ability to be able to manage her thinking and she goes into a deep depression . . . ." (Tr. 376.) Ms. Hartley opined that Moss

8

would not be able to work and handle the stressors of working." (Tr. 376.) In August of 2007, Moss's pain management specialist G. David Bojrab, M.D., opined that she could not work and that her depression, anxiety, nervousness, and fatigue would affect her ability to work at a regular job on a sustained basis. (Tr. 542-43.)

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

# IV. ANALYSIS

## A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On October 5, 2007, the ALJ rendered his decision. (Tr. 29-42.) He found at step one of the five-step analysis that Moss had not engaged in substantial gainful activity since her alleged onset date. (Tr. 31.) At step two, he concluded that Moss had the following severe impairments: back and neck pain due to degenerative disc bulging/protrusions/degenerative arthritis of the thoracic and cervical spine with thoracic radiculitis and cervical radiculopathy; abdominal pain problems diagnosed as hepatic cirrhosis resulting in vasovagal syncope/possible transient ischemic attack with evidence of possible tiny old lacunar infarct in the inferior aspect of the right basal ganglia versus volume averaging artifact; hypertension and history of heart murmur/palpitations; hypokalemia and borderline diabetes; and major depressive disorder. (Tr. 31.) The ALJ then at step three determined that Moss's impairments or combination of impairments were not severe enough to meet a listing. (Tr. 31.)

Before proceeding to step four, the ALJ assigned her the following RFC:

> [P]rior to February 10, 2006, the claimant had the residual functional capacity to perform, at a maximum, "medium" work, . . . that did not involve understanding, remembering and carrying out more than simple, routine, repetitive tasks. She was not able to make more than simple work-related decisions or work in an environment where there were fast-paced production requirements or more than occasional and simple workplace changes. In addition, the claimant could have only brief and occasional interactions with others. She could not work with the general public and worked best alone, in semi-isolation from others or in small groups. She was able to lift and carry fifty pounds occasionally and twenty-five pounds frequently. In an eight-hour period, the claimant was able to sit or stand/walk for a total of six hours each.

(Tr. 32.) He continued:

> [B]eginning on February 10, 2006, the claimant has had the residual functional capacity to perform, at a maximum, "light" work . . . . She is able to lift and carry

11

twenty pounds occasionally and ten pounds frequently. In an eight-hour period, the claimant is able to sit or stand/walk for a total of six hours each. In addition, the claimant's mental residual functional capacity for the period beginning on February 10, 2006 is the same as her mental residual functional capacity for the period prior to February 10, 2006.

(Tr. 39.)

In arriving at his RFC determination for the period beginning on February 10, 2006, the ALJ found that Moss's "allegations regarding her symptoms and limitations are generally credible." (Tr. 39.) He articulated no credibility determination, however, with respect to the period prior to February 10, 2006.

Based on the RFC and the VE's testimony, the ALJ concluded at step four that Moss was unable to perform her past relevant work. (Tr. 40.) The ALJ then concluded at step five, based on the VE's testimony, that *prior* to February 10, 2006, Moss could have performed a significant number of other jobs within the economy, including conveyor tender, hand packager, and machine feeder. (Tr. 41.) He also determined that beginning on February 10, 2006, Moss's ability to perform all or substantially all of the requirements of light work were impeded by additional limitations, and based upon the VE's testimony, there are no jobs in the national economy that she could perform. (Tr. 41.) Therefore, the ALJ found that Moss was not disabled prior to February 10, 2006, but became disabled on that date and continued to be disabled through the date of his decision. (Tr. 41.)

### C. The ALJ Failed to Analyze Moss's Credibility.

Moss contends that the ALJ improperly evaluated her symptom testimony. Her challenge ultimately has merit; indeed, the ALJ did not evaluate her credibility regarding her symptoms prior to February 10, 2006, *at all*.

"Credibility determinations are the second step in a two-step process prescribed by the regulations for evaluating a claimant's request for disability benefits based on pain." *Aidinovski v. Apfel*, 27 F. Supp. 2d 1097, 1103 (N.D. Ill. 1998); *see* 20 C.F.R. § 404.1529; *Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); SSR 96-7p. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment (that is, an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques) that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. § 404.1529; *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); SSR 96-7p. If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p.

If, however, the medical evidence shows the existence of an underlying impairment that could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see also* 20 C.F.R. § 404.1529(c); *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); *Williams*, 915 F. Supp. at 964. "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p.

In addition to the objective medical evidence, the ALJ must consider the entire case record to determine whether the claimant's statements are credible. *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). "Factors that must be considered include the nature and intensity of

claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities." *Id*.; 20 C.F.R. § 404.1529(c); SSR 97-6p. Although the ALJ is not required to "analyze or elaborate on each of [these] factors," he should "discuss most of the factors and connect them to the credibility determination." *Wirth v. Barnhart*, 318 F. Supp. 2d 726, 743 (E.D. Wis. 2004).

The Commissioner seems to agree that the ALJ failed to engage in the requisite credibility analysis, but contends that "the ALJ's analysis of the weight to be given to the medical opinions in the record contained sufficient discussion of the factors used in determining the credibility of the Plaintiff's testimony." (Resp. Br. 14-15.) Moss also notes that the ALJ "mentions in a general way the type of evidence that he must consider in determining credibility[,]" but contends he nevertheless should have explained why he discredited her testimony. (Opening Br. 23.) Admittedly, the ALJ's opinion recites (thoroughly and at length) the details of Moss's testimony and her treatment history. Nevertheless, as Moss correctly maintains, his failure to engage in any evaluation of those facts to make a credibility determination constitutes reversible error.

"While the court must defer to an ALJ's credibility assessment of a witness (unless it is patently wrong), the court 'must first be certain that a credibility determination has actually been made.'" *Khan v. Chater*, No. 96 C 2872, 1997 WL 669764, at *4 (N.D. Ill. Oct. 22, 1997) (quoting *Schroeter v. Sullivan*, 977 F.2d 391, 394-95 (7th Cir. 1992)). "The Seventh Circuit has regularly recognized that, consistent with SSR 96-7p, an ALJ may not disregard a claimant's testimony about the severity of her symptoms without providing careful analysis." *Phillips v.*

*Astrue*, 601 F. Supp. 2d 1020, 1030 (N.D. Ill. 2009) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353-55 (7th Cir. 2005); *Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488-89 (7th Cir. 2007)). This analysis is important in the instant case because the VE testified that if Moss's testimony were believed, there would be no jobs that she could perform. (*See* Tr. 616.)

The Commissioner essentially posits that the ALJ's determination on the credibility of Moss's testimony can be inferred through his analysis of the medical opinions of record. This assertion is problematic because "nothing in Social Security Ruling 96-7p suggests that the reasons for a credibility finding may be implied. Indeed, the cases make clear that the ALJ must specify the reasons . . . so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski*, 322 F.3d 916 (collecting cases). "In the present case, while the ALJ . . . discussed some of the relevant [regulatory] factors . . . in the body of his decision (e.g. daily activities, use of pain medication), he never linked that discussion to his determination that plaintiff's testimony failed to support her claim of disability. Because [the Court] cannot infer a credibility determination from a general discussion of the evidence . . . this was error[.]" *Schwabe v. Barnhart*, 338 F. Supp. 2d 941, 955-56 (E.D. Wis. 2004) (citing *Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1028-29 (E.D. Wis. 2004); *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (holding that when an ALJ rejects a claimant's testimony and denies benefits, he must build an accurate and logical bridge from the evidence to his conclusion); *Golembiewski*, 322 F.3d at 915-16; *Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (reversing where decision lacked explanation allowing the court to understand the weight given to the claimant's statements or the reasons for that consideration as required by

SSR 96-7p); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002) ("Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed.")).

Consequently, the ALJ "failed to follow the strictures of the Social Security Rulings by failing to make a credibility determination of plaintiff's symptoms and pain prior to [February 10, 2006]. As the ALJ neglected to make any credibility determination, it is clear that he failed to 'build an accurate and logical bridge between the evidence and the result[.]'" *Spaulding v. Barnhart*, No. 05 C 6311, 2007 WL 1610445, at *5 (N.D. Ill. Mar. 2, 2007) (quoting *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citing *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000))). The Court will therefore reject the Commissioner's invitation to infer the reasons why the ALJ discounted Moss's testimony, and rather remand the case so that the ALJ may make a proper credibility determination in accordance with 20 C.F.R. § 404.1529, SSR 96-7p, and applicable case law.

## V. CONCLUSION[5]

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this

---

[5] Because a remand is warranted on the challenge to the ALJ's credibility determination, the Court need not reach Moss's remaining argument.

Opinion. The Clerk is directed to enter a judgment in favor of Moss and against the Commissioner.

SO ORDERED.

Enter for this 20th day of July, 2009.

S/Roger B. Cosbey<br>Roger B. Cosbey,<br>United States Magistrate Judge